## Chicago Union Traction Company v. Frederick Theorell.

### Gen. No. 11,576.

1. SCAFFOLD—*duty of master to furnish reasonably safe, defined.* It is not the duty of a master to furnish a scaffold to his servant which is reasonably safe for all uses and purposes; it is the duty of such master to furnish a scaffold that is reasonably safe for the uses and purposes for which it is required and intended.

2. SCAFFOLD—*how question of safety of, determined.* In determining whether a scaffold, platform or other structure is reasonably safe for the uses and purposes for which it is furnished and intended, the court will consider the structure itself, the uses and purposes for which it is required and intended, the length of time its use will be required, by whom it is to be used or occupied and the kind and amount of work to be done thereon.

3. SCAFFOLD—*what does not necessarily render, unsafe.* A scaffold may be reasonably safe notwithstanding it may not have been provided with a railing.

4. ASSUMED RISK—*when doctrine of, applies.* Where a defect is so plain and obvious to the senses that in the exercise of ordinary care an employee would discover it, and he continues in the employment without complaint and without any assurance by the master that the defect will be repaired or the danger removed, he assumes the risk arising from it.

Action on the case for personal injuries. Appeal from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1903. Reversed. Opinion filed May 5, 1905.

**Statement by the Court.** This is an appeal by the defendant from a judgment for $25,000, recovered against it by appellee in an action on the case for personal injuries. The declaration alleged that the defendant had a certain elevated railroad and was constructing coal bins near to said road, the bottoms whereof were on a level with the tracks of the railroad and fourteen feet above the ground; that the plaintiff was employed by the defendant to work on said coal bins; that the defendant negligently, etc., permitted an open space to remain between said track and said coal bins without guards, etc., to prevent plaintiff from falling through such open space, and that while so employed

and while exercising due care, etc., plaintiff was suddenly precipitated and thrown through said open space down to the ground and thereby sustained the injuries complained of.

The evidence shows that the elevated railroad structure was erected before the building of the coal bins was begun. The railroad structure consisted of posts which supported cross-beams upon which longitudinal girders were placed, upon which sawed ties twelve feet long were laid six inches apart. Upon these ties iron rails four feet eight and one-half inches apart were laid equidistant from the outer ends of the ties. Upon the ties, at either end, were fastened guard rails which consisted of planks four inches by ten, laid flush with the ends of the ties. To support the coal bins a framework of posts and beams was erected. Upon the beams, timbers, six inches thick and fourteen inches high, were placed running parallel with the guard rails. These timbers formed the sills of the coal bins. Upon them the floor of the bins was laid and they supported the upright posts to which were fastened the planks which formed the sides of the bins. The top of the sills was two inches above the top of the guard rail. The distance between the guard rail of the railroad and the sills of the coal bins was, according to the testimony of plaintiff's witnesses, eighteen inches, and according to .the testimony of defendant's witnesses, fourteen inches. Each coal bin was sixteen feet long and six feet high. The frame of a bin consisted of a sill on each side, upon which were set three posts. To secure a post to the sill a bolt passed through the sill from top to bottom, the upper end of which was fastened to the lower end of the post. On the top of the posts were placed the plates which carried the rafters.

· The plaintiff was a carpenter and had worked at his trade twenty years before the accident. He took no part in erecting the framework, built to support the bins, but had been engaged in putting up the framework of the bins for four or five weeks, according to his testimony, or from six to seven weeks, according to the testimony of defendant's witnesses. His work had been, with the aid of another car-

penter, to set up the posts, fasten them to the sill, plumb them and secure them in position.    Other carpenters nailed to them the planks which formed the sides of the bins. He had taken part in setting up the frames of more than sixty bins before the accident.    Bins were built on each side of the railroad.    On the outside of the bins, on the sides away from the railroad, the carpenters built scaffolds. The top of the railroad structure was used by the carpenters as a scaffold for their work upon the inside sides of the bins. Upon it were placed the lumber and other materials used in building the bins and upon it the carpenters framed the timbers which went into the frames of the bins.    In putting up the posts the carpenters stood either on the structure built to support the bins, or upon the guard rail, ten inches broad, which was at the outer edge of the railroad structure, or on both, and the carpenters when nailing the planks to the framework of the bins stood on the guard rail.

Just before the accident plaintiff was on the top of the railroad structure, between the rails, engaged in fitting a bolt to a post.    He heard his foreman, who was on the ground, call out to him, "Andy, come here," and went out to and upon the guard rail.    His own testimony in chief as to what then occurred was as follows:

"When I heard my foreman call I went right straight out to hear what he said, and I don't know, so soon I got out there I lost my balance.    I lost my balance and fell down and that is the last I know of."

On cross-examination, as follows:

"Q.    You said you became overbalanced?    A.    I just lost my balance, my feet—

"Q.    Did you become dizzy, was that it?    A.    No, I couldn't remember that—when I got there it was just about —I don't know.    I just lost my balance and my feet went under me and that is all I can tell.

\*        \*        \*        \*        \*        \*        \*

"Q.    Well, the truth of the matter is, that you don't remember what made you fall?    A.    No, I really—I know I can't tell about that because—all that I can tell is that it was pretty windy that day and when I got out there you know I just lost my balance and dropped between that."

The plaintiff sustained exceedingly severe injuries which rendered him practically helpless up to the time of the trial, and from the evidence it would appear that there is little ground to hope that he will ever be able to do any kind of work.

JOHN A. ROSE and LOUIS BOISOT, for appellant; W. W. GURLEY, of counsel.

THEODORE G. CASE and JOHN T. MURRAY, for appellee; A. W. BROWNE, of counsel.

MR. PRESIDING JUSTICE BAKER delivered the opinion of the court.

The plaintiff was in the service of the defendant and the law imposed upon the defendant the duty to use reasonable care to furnish the plaintiff a reasonably safe place to work. The defendant may be regarded as having furnished to the carpenters employed to erect the coal bins, the elevated railroad structure as a scaffold to be used in such work. Considering the top of this structure as the floor of the scaffold so furnished, the evidence shows that it was twelve feet wide, that its floor was made of flat ties placed six inches apart through which it was not possible for a man to fall. It was a safe place to put material required for the bins and for men to work upon in framing and fitting the lumber and other materials used in the construction of the bins.

The contention is, that it was unsafe and dangerous because there was a space eighteen inches broad between the outer edges of the guard rails and the adjacent sides of the sills of the coal bins. The duty of the defendant was not to furnish a scaffold or platform that was reasonably safe for all uses and purposes, but to furnish a scaffold or platform that was reasonably safe for the uses and purposes for which a scaffold was required and for the use which was intended to be and was made of it by the plaintiff and other employees employed by the defendant in the work of erecting the coal bins in question.

In determining whether a scaffold platform or other structure is reasonably safe for the uses and purposes for which it is furnished and intended, we must consider the structure itself, the uses and purposes for which such structure is required and intended, the length of time its use will be required, by whom it is to be used or occupied and the kind and amount of work to be done thereon.

That a veranda of a hotel, apartment house, or private dwelling, any considerable distance above the ground, which is not enclosed by a railing or balustrade on the sides away from the building and has a space eighteen inches broad between the floor of the veranda and the building, would not be a reasonably safe veranda is certain. Such a veranda is a permanent structure, intended for permanent use; intended to be used and occupied in the evening as well as in the daytime, and by children as well as by adults.

If a man intends to use the flat roof of his house for a summer garden he must enclose it with a balustrade to make it reasonably safe for that purpose; but if a new roof is required and he employs men to put it on, he would not be required to enclose his roof with a railing in order to make it a reasonably safe place for the men to work in putting on the new roof.

A scaffold or platform was required in this case on the side of a coal bin next to the railroad solely for the plaintiff and the carpenter who worked with him, to stand on while setting up the framework of a bin on that side, and for the other carpenters to stand on while nailing to the framework the planks which formed that side of the bin. A bin was sixteen feet long and six feet high. Plaintiff and one other carpenter in about thirty days, according to the testimony for the plaintiff, or in about forty days, according to the testimony for the defendant, framed and put in place the framework of more than sixty bins, which would amount to one-half or at most two-thirds of a day for each bin and only one-half of this work was done on the side of the bin next to the railroad. Two carpenters would require but an hour or two, to nail on planks to cover a space

of sixteen feet by six, so that all of the work to be done on the side of a coal bin next to the railroad, for which alone a scaffold was required, could be done by two carpenters in less than one day.

Plaintiff and the other men employed by the defendant to work on the coal bins were experienced carpenters and men of full age. Considering the top of the railroad structure as the floor of a scaffold, the scaffold furnished was, as has been said, twelve feet broad with a floor through which a man could not possibly fall and at its outer edge, the edge next to the coal bin, was a plank ten inches wide. The space between the plank and the sill of the coal bin was at most eighteen inches, half a pace broad, and the one but two inches higher than the other. A carpenter in setting up the framework of a bin could without inconvenience or danger stand with one foot on the guard rail and the other on the sill of a coal bin. A carpenter in nailing planks to the side of the bin could, without inconvenience or danger, stand upon the guard rail, eighteen inches away from the sill. Indeed, if the scaffold had extended to the sill a carpenter in nailing planks to the side of the bin would, for his own convenience, stand at least eighteen inches away from the sill. The top of the railroad structure afforded a safe, sufficient and convenient floor or scaffold for the carpenters to stand upon while doing all the work required to be done in putting up the side of the scaffold next to the structure. The plaintiff was not injured by the giving away of the scaffold, nor even by falling from it while directly engaged in work upon the coal bin. He fell by going to the outer edge of the guard rail to answer an inquiry of his foreman. Such an accident might have happened upon any scaffold which was not enclosed by a railing.

It is a matter of common knowledge that the scaffolds on which bricklayers, painters and carpenters work are not enclosed by railings, nor is a railing necessary to make a bricklayer's scaffold reasonably safe for a bricklayer, a painter's scaffold or staging reasonably safe for a painter, or a carpenter's scaffold reasonably safe for a carpenter.

These considerations and others that might be stated lead us to the conclusion, that considering the top of the railroad structure as a scaffold, furnished by the defendant to the plaintiff, such structure must be regarded as reasonably safe, and the defendant cannot be held guilty of negligence in furnishing the same, or in failing to furnish to plaintiff another or different scaffold.

To the contention that the defendant negligently permitted the guard rail to remain covered with grease and oil and that by reason thereof the plaintiff slipped and fell, it must be answered, that there is no such charge of negligence in the declaration, nor is there any evidence in the record tending to show that the greasy condition of the guard rail, if it was greasy, caused or in any manner contributed to the fall of the plaintiff.

There is another view to be taken in the case, which is also conclusive against the plaintiff's right of recovery. The fact that there was an open space between the guard rail and the sill of the coal bin was patent and obvious. The same space existed between the guard rail and the sill of each of the sixty and more coal bins upon which plaintiff had worked. "If a defect is so plain and obvious to the senses that in the exercise of ordinary care the employee would discover it, and he continues in the employment without complaint and without any assurance by the master that the defect will be repaired or the danger removed, he assumes the risk arising from it." C. & E. I. R. R. Co. v. Heery, 203 Ill. 492–497, and cases there cited.

Under the facts of this case and the rules of law relating to the assumption of risk, if the existence of the open space complained of could be regarded as a defect which made the scaffold or platform unsafe or dangerous, the plaintiff must be held to have assumed the risk arising from such defect.

The judgment of the Superior Court will be reversed with findings of fact.

*Reversed.*